```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- X
                                                                       :
    EBERHARD KORNOTZKI,                                                :
                                                                       :
                                    Plaintiff,                         :     19-CV-6689 (JMF)
                                                                       :
                    -v-                                                :     OPINION AND ORDER
                                                                       :
    TARIQ JAWAD,                                                       :
                                                                       :
                                    Defendant.                         :
                                                                       :
---------------------------------------------------------------------- X
```

JESSE M. FURMAN, United States District Judge:

Defendant Tariq Jawad ("Jawad") brings counterclaims against Plaintiff Eberhard Kornotzki ("Kornotzki") under the federal Stored Communications Act, the Pennsylvania Wiretapping Act, and state tort law. Jawad alleges that Kornotzki intentionally accessed Jawad's email account without authorization while Kornotzki worked as a contractor for Jawad's business. Kornotzki now moves to dismiss Jawad's counterclaims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, Kornotzki's motion is GRANTED as to Jawad's counterclaim for tortious interference with business relations and DENIED as to Jawad's other counterclaims.

## FACTUAL BACKGROUND

The following facts — drawn from Jawad's Amended Answer and Counterclaim Complaint ("Counterclaim Complaint"), ECF No. 24 ("Compl.") — are assumed to be true for purposes of this motion. *See, e.g.*, *City of New York v. N.Y. Pizzeria Delicatessen, Inc.*, No. 05-CV-2754 (KMK), 2006 WL 2850237, at *3 (S.D.N.Y. Sept. 29, 2006).

Jawad provides "a variety of consulting and fundraising services to businesses and individuals across numerous economic sectors and markets," including China and Europe. Compl.

¶ 10.  From 2012 to 2016, Jawad did business as an individual, occasionally using the name "Bridge."  *Id.* ¶¶ 11, 14.  In 2016, Jawad formally incorporated his business under the name "Bridge Innovations, Inc."  *Id.* ¶ 8.

In 2012, Jawad "reached an informal understanding" with Kornotzki for the latter to "provid[e] 'back office' and translational services to Jawad and Jawad's clients."  *Id.* ¶ 13.  Kornotzki also "manage[d] Bridge's email and web services," including by "arrang[ing] and "administer[ing] Bridge's domain name system."  *Id.* ¶ 15.  Bridge's domain name was provided by a "third party service provider."  *Id.* ¶ 15.  At Kornotzki's direction, the provider "issue[d] email addresses featuring the '@bridgeinnov.com' domain name to [Kornotzki] and Jawad, as well as to at least six other independent contractors working for Jawad."  *Id.* ¶ 15.  Kornotzki continued to work for Jawad from 2012 to May 5, 2019, when Kornotzki "terminat[ed] their working relationship."  *Id.* ¶¶ 11, 18.

Although Kornotzki administered Bridge's domain name system, Jawad did not authorize Kornotzki to "access Jawad's email account" or "interfer[e] with Jawad's ability to access information contained within his email account."  *Id.* ¶¶ 52-53.  The third-party service provider also did not authorize Kornotzki to "access Jawad's individual email account or the emails maintained therein."  *Id.* ¶ 56.  Bridge's company policies also did not authorize Kornotzki to access Jawad's email account.  *Id.* ¶ 57.  In November 2018, "Jawad and other Bridge contractors began to repeatedly ask Kornotzki to transfer the '@bridgeinnov.com' domain to a U.S. based company so that Jawad and/or Bridge could exercise control over Bridge's email system."  *Id.* ¶ 89.  Jawad requested the change, in part, because he otherwise could not access "archived emails and data," including "market studies, research, and analyses that Jawad conducted or drafted in the past."  *Id.* ¶¶ 87-88.  Kornotzki refused.  *Id.* ¶ 90.

Beginning in April 2019, Kornotzki "repeatedly accessed Jawad's '@bridgeinnov.com' email account." *Id.* ¶ 50.  In doing so, Kornotzki learned of Bridge projects that did not involve Kornotzki and a conference that Jawad had been registered to attend. *Id.* ¶¶ 59, 61-62.  Kornotzki used this information to serve Jawad with the complaint that Kornotzki filed in this case. *Id.* ¶ 61. In addition, shortly after terminating his working relationship with Jawad, Kornotzki "turned off and on repeatedly" Jawad's access to Jawad's email account. *Id.* ¶ 60.  Finally, Kornotzki continued to "prohibit[] Jawad from accessing archived email and data, even when Jawad can otherwise access his account," knowing that doing so would "deny Jawad access to the material and information contained therein that would assist Jawad to secure . . . new business." *Id.* ¶¶ 87, 95. The denial of access has "actively interfered with Jawad's ability to solicit and secure new business for himself and Bridge." *Id.* ¶ 91.

When Jawad realized that Kornotzki had accessed Jawad's email account, Jawad disclosed the issue to "multiple third parties with whom he was doing business and negotiating future business." *Id.* ¶ 66.  Following the disclosure, several third parties "suspended or canceled their business with Jawad," including a "European government entity," "multiple European clean technology companies," a "ham producer in Spain," a "Chinese meat retailer," and a "Norwegian non-profit corporation." *Id.* ¶¶ 68-79.  In addition, a company called AgNovos, for whom Jawad and Kornotzki had performed work together, "ceased pursuing multiple business opportunities with Jawad." *Id.* ¶¶ 32-33, 80.

On July 17, 2019, Kornotzki instituted the present action, bringing claims against Jawad for breach of contract and the covenant of good faith and fair dealing and for unjust enrichment.  *See* ECF No. 1, ¶¶ 31-49.  On December 4, 2019, Jawad filed the Counterclaim Complaint, asserting counterclaims against Kornotzki for violating the Stored Communications Act, 18 U.S.C. §§ 2701 *et seq.*, and the Pennsylvania Wiretapping Act, 18. Pa. Stat. Code §§ 5741 *et seq.*, and for tortious

interference with business relations and invasion of privacy. Compl. ¶¶ 98-151. Kornotzki now moves to dismiss Jawad's counterclaims under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* ECF No. 28.

## LEGAL STANDARDS

"A motion to dismiss counterclaims pursuant to Rule 12(b)(6) is decided under the same standard as that of a motion to dismiss the claims of a complaint." *Grewal v. Cuneo*, No. 13-CV-6836 (RA), 2016 WL 308803, at *6 (S.D.N.Y. Jan. 25, 2016). A claim will survive a Rule 12(b)(6) motion only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555. If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## DISCUSSION

Kornotzki moves to dismiss all four of Jawad's counterclaims. The Court will begin with Jawad's claims under the Stored Communications Act and the Pennsylvania Wiretapping Act, which "mirrors the federal statute and is interpreted accordingly." *Ideal Aerosmith, Inc. v. Acutronic USA, Inc.*, No. 07-CV-1029, 2007 WL 4394447, at *6 (E.D. Pa. Dec. 13, 2007). The Court will then turn to Jawad's common law claims.

**A. Stored Communications Act and Pennsylvania Wiretapping Act Claims**

Title II of the Electronic Communications Privacy Act is known as the Stored Communications Act or "SCA." *See Matter of Warrant to Search a Certain E-Mail Account Controlled and Maintained by Microsoft Corp.*, 829 F.3d 197, 205 (2d Cir. 2016), *vacated and rev'd on other grounds sub nom. United States v. Microsoft Corp.*, 138 S. Ct. 1186 (2018). The "SCA was enacted to extend to electronic records privacy protections analogous to those provided by the Fourth Amendment." *Id.* at 206 (internal quotation marks omitted). Among other things, the SCA "prohibits unauthorized third parties from . . . obtaining or altering electronic communications stored by an [electronic communication service]." *Id.* at 207.

In particular, the SCA makes it unlawful to either (1) "intentionally access[] without authorization a facility through which an electronic communication service is provided" or (2) "intentionally exceed[] an authorization to access that facility," and in either case, "thereby obtain[], alter[], or prevent[] authorized access to a wire or electronic communication while it is in electronic storage in such system." 18 U.S.C. § 2701(a). "[E]lectronic storage" is defined as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof," as well as "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. §§ 2510(17), 2711(1). An "electronic communication service" is defined, in turn, as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. §§ 2510(15), 2711(1). The term "facility" is not defined by the statute, but courts have concluded that "'facilities' under the SCA are network service providers, which includes telephone companies, internet or e-mail service providers, and bulletin board services." *Walker v. Coffey*, 956 F.3d 163, 168 (3d Cir. 2020) (internal quotation marks omitted).

Thus, the SCA applies to the intentional, unauthorized accessing of an email account stored on a third-party electronic communication service provider's server. *See Pure Power Boot Camp v.*

*Warrior Fitness Boot Camp*, 587 F. Supp. 2d 548, 555-56 (S.D.N.Y. 2008) (stating that accessing an account on Microsoft's Hotmail system without authorization to obtain another party's emails "while they were in storage" "would be a violation of the SCA"); *Kaufman v. Nest Seekers, LLC*, No. 05-CV-6782 (GBD), 2006 WL 2807177, at *7 (S.D.N.Y. Sept. 26, 2006) (denying a motion to dismiss an SCA claim based on unauthorized accessing of emails stored on the server of a real estate broker website). Thus, in *Obeid on behalf of Gemini Real Estate Advisors LLC v. La Mack*, No. 14-CV-6498 (LTS) (MHD), 2017 WL 1215753 (S.D.N.Y. Mar. 31, 2017), for example, the court denied a motion to dismiss an SCA claim where the claimants alleged that a former business partner had installed spy software to access the claimants' email accounts, which were "hosted by [a] third-party information provider." *Id.* at *9. The court concluded that such allegations were sufficient "because the weight of authority . . . holds that emails stored on an electronic communication service provider's systems after it has been delivered, as opposed to emails stored on a personal computer, are stored communications subject to the SCA." *Id.*

Applying these standards here, Jawad's allegations are sufficient to state claims under the SCA and, by extension, the Pennsylvania Wiretapping Act. Like the plaintiff in *Obeid on behalf of Gemini Real Estate Advisors LLC*, Jawad alleges that Kornotzki intentionally and without authorization accessed Jawad's email account, which was "issue[d]" by "a third party service provider." Compl. ¶¶ 15, 50, 56. Although the Counterclaim Complaint is not explicit about where the email messages were stored when Kornotzki allegedly accessed them, it can — and, at this stage of the litigation, must — be inferred that they were stored on servers maintained by the third-party service provider. *See* Compl. ¶¶ 87-90 (alleging that Jawad could not access "archived emails and data" until "the '@bridgeinnov.com' domain" was transferred "to a U.S. based company"). Certainly, nothing in the Counterclaim Complaint indicates that the messages were stored locally on

6

the account-holders' computers. Accordingly, the Counterclaim Complaint plausibly alleges violations of the SCA and the Pennsylvania statute.

Kornotzki's counterarguments are unpersuasive. He argues first that the alleged conduct falls within the SCA's exception for "conduct authorized by the person or entity providing the electronic communication service." ECF No. 29 ("Pl. Mem."), at 4 (quoting 18 U.S.C. § 2701(c)(1)). Specifically, Kornotzki claims that, because he "arranged and administered Bridge's domain name system," he "provided an email service to [Jawad]" and thus "is immune from liability for accessing emails stored in his facilities." *Id.* at 5-7 (citing *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107 (3d Cir. 2003)). But the exception in Section 2701(c)(1) applies only to providers of electronic communication services. To be a provider, it is not enough to "purchase[] Internet services, such as e-mail." *In re Jetblue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299, 307-08 (E.D.N.Y. 2005) (holding that "JetBlue does not become an 'electronic communication service' provider simply because it maintains a website that allows for the transmission of electronic communications between itself and its customers"). Instead, providers facilitate the exchange of electronic communications through their servers. *See, e.g.*, *Garcia v. City of Laredo*, 702 F.3d 788, 792 (5th Cir. 2012) ("[T]he statute envisions a *provider* (the [Internet Service Provider ('ISP')] or other network service provider) and a *user* (the individual with an account with the provider), with the *user's communications in the possession of the provider*." (quoting Orin S. Kerr, *A User's Guide to the Stored Communications Act, and a Legislator's Guide to Amending It*, 72 Geo. Wash. L. Rev. 1208, 1215 n.47 (2004)); *see also, e.g.*, *Theofel v. Farey-Jones*, 359 F.3d 1066, 1072-73 (9th Cir. 2004) ("[T]he [SCA] protects users whose electronic communications are in electronic storage with an ISP or other electronic communications facility."). Kornotzki may have managed Bridge's domain name system for the company, but — at least according to the

7

allegations in the Counterclaim Complaint — he did not "provide" any electronic communication services.

Relatedly, Kornotzki argues that he was authorized to access Jawad's emails "like an employer" would be authorized to access its employees' emails. *See* Pl. Mem. 5. Courts have indeed held that an employer "has the right to search" employees' emails because the employer provided "the ability to send and receive electronic communications." *Freedom Calls Found. v. Bukstel*, No. 05-CV-5460 (SJ) (VVP), 2006 WL 845509, at *27 (E.D.N.Y. Mar. 3, 2006) ("Plaintiff has the right to 'intercept,' that is, receive and review future e-mails . . . because Plaintiff is an employer and monitoring is necessary to ensure that current and prospective Supporter and Client email messages are answered in a timely fashion."). But the Counterclaim Complaint alleges that Kornotzki was an independent contractor, not Jawad's employer. *See* Compl. ¶ 13. Moreover, even if Kornotzki had been Jawad's employer, courts have applied the employer exception only where the employer actually administered and stored the company email system on company servers. *See Freedom Calls*, 2006 WL 845509, at *27 ("To the extent that prior e-mails sent to Defendant's [work] email account *are stored on Plaintiff's computer system*, Plaintiff has the right to search these stored emails." (emphasis added)); *Fraser*, 352 F.3d at 115 ("[B]ecause Fraser's e-mail was stored on Nationwide's system (which Nationwide administered), its search of that e-mail falls within § 2701(c)'s exception."); *Williams v. Rosenblatt Sec. Inc.*, 136 F. Supp. 3d 593, 607 (S.D.N.Y. 2015) (noting that an employer "was authorized to access" an employee's emails given that the "computer and server belong[ed] to [the employer] and that [the employer] had the right to the work product on the computer"); *see also Pure Power Boot Camp*, 587 F. Supp. 2d at 560 (holding that an employer was not authorized to access a former employee's Hotmail account because "the employee . . . did not store any of the communications which his former employer now seeks to use against him on the employer's computers, servers, or systems; nor were they sent from

8

or received on the company e-mail system or computer"). According to the Counterclaim Complaint, that was not the case here.

Accordingly, Kornotzki's motion to dismiss Jawad's claims under the SCA and the Pennsylvania Wiretapping Act claim must be and is denied.

**B. Invasion of Privacy**

Next, Kornotzki moves to dismiss Jawad's claim for invasion of privacy by intrusion upon seclusion under Pennsylvania law.[1] "There are four types of invasion of privacy in Pennsylvania: (1) publicity given to private life; (2) intrusion upon seclusion; (3) appropriation of name or likeness; and (4) publicity placing a person in a false light." *Tucker v. Merck & Co., Inc.*, 102 F. App'x 247, 256 (3d Cir. 2004). "To state a claim for intrusion upon seclusion, a plaintiff must allege conduct which demonstrates 'an intentional intrusion upon the seclusion of their private concerns which was substantial and highly offensive to a reasonable person, and aver sufficient facts to establish that the information disclosed would have caused mental suffering, shame or humiliation to a person of ordinary sensibilities.'" *Thompson v. Ross*, No. 2:10-CV-479, 2010 WL 3896533, at *6 (W.D. Pa. Sept. 30, 2010) (quoting *Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co.*, 809 A.2d 243, 247 (Pa. 2002)). "Intrusion upon seclusion requires that the plaintiff has a reasonable expectation of privacy." *Corr. Med. Care, Inc. v. Gray*, No. 07-CV-2840, 2008 WL 248977, at *10 (E.D. Pa. Jan. 30, 2008).

Applying this standard, the Court concludes that Jawad adequately pleads a claim for intrusion upon seclusion. He alleges that Kornotzki intentionally accessed his email account without authorization, and thereby read email messages about business projects that did not involve Kornotzki, interrupted Jawad's access to his own e-mail account, and tracked Jawad's movements

---

[1] Kornotzki does not challenge the applicability of Pennsylvania law, *see* Pl. Mem. 9; Reply 5-6, which suffices to establish choice-of-law. *See, e.g.*, *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011).

so that Kornotzki could physically serve Jawad "as Jawad was walking into a small conference he was attending." Compl. ¶¶ 58-61. This suffices to state a claim for intrusion upon seclusion. *See, e.g.*, *Vernars v. Young*, 539 F.2d 966, 969 (3d Cir. 1976) (stating that "opening plaintiff's private mail and reading it without authority" would constitute an intrusion upon seclusion); *Doe v. Kohn Nast & Graf, P.C.*, No. 93-CV-4510, 1994 WL 517989, at *2 (E.D. Pa. Sept. 20, 1994) (same); *see also* Restatement (Second) of Torts, § 652B(b) (1977) ("The invasion may be . . . by some other form of investigation or examination into his private concerns, *as by opening his private and personal mail* . . . ." (emphasis added)).

Once again, Kornotzki's counterarguments are unavailing. Two of these arguments echo those the Court has already rejected with respect to Jawad's statutory claims: namely, that Kornotzki was authorized to access Jawad's emails as the email service provider, *see* Pl. Mem. 9, and that that "there is no reasonable expectation of privacy in e-mail communications" by employees contained in their work email accounts, ECF No. 32 ("Reply") at 6. They are no more successful here. *See, e.g.*, *Smyth v. Pillsbury Co.*, 914 F. Supp. 97, 101 (E.D. Pa. 1996) ("[W]e do not find a reasonable expectation of privacy in e-mail communications voluntarily made by an employee *to his supervisor on the company e-mail system*." (emphasis added)); *see also Kelleher v. City of Reading*, No. 01-CV-3386, 2001 WL 1132401, at *5 (E.D. Pa. Sept. 24, 2001) (noting "the possibility that an employee might have a reasonable expectation of privacy in certain e-mail communications, depending upon the circumstances of the communication and the configuration of the e-mail system"). Kornotzki's remaining contention is that "[a]n ordinary person would not find" his alleged conduct "highly offensive." Pl. Mem. 9. In support of that assertion, Kornotzki cites *Popa v. Harriet Carter Gifts, Inc.*, 426 F. Supp. 3d 108 (W.D. Pa. Dec. 6, 2019), in which a court held that a website's tracking of its users' keystrokes and mouse clicks while they were visiting the site "is simply not the type of highly offensive act to which liability can attach." *Id.* at

122. But the allegations in this case are a far cry from those in *Popa*. Jawad did not voluntarily enter an "electronic marketplace" in which he knew he might be tracked. *Id.* To the contrary, according to the Counterclaim Complaint, Kornotzki accessed Jawad's email account despite Jawad's efforts to keep it private. Accordingly, Kornotzki's motion to dismiss the invasion of privacy claim is also denied.

## C. Tortious Interference with Business Relations

By contrast, Kornotzki's motion to dismiss Jawad's claim for tortious interference with business relations — which is brought under New York law — has merit. *See* Pl. Mem. 7-8.[2] To state such a claim, Jawad must allege that "(1) [he] had a business relationship with a third party; (2) [Kornotzki] knew of that relationship and intentionally interfered with it; (3) [Kornotzki] acted solely out of malice, or used dishonest, unfair, or improper means; (4) [Kornotzki's] interference caused injury to the relationship or breach of the contract; and (5) [Kornotzki's] activities were directed at the third party." *Rosa v. TCC Commc'ns, Inc.*, No. 15-CV-1665 (WHP), 2016 WL 67729, at *4 (S.D.N.Y. Jan. 5, 2016). Thus, "[t]he defendant's interference must be direct: the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff." *Ritani, LLC v. Aghjayan*, 880 F. Supp. 2d 425, 451 (S.D.N.Y. 2012) (internal quotation marks omitted); *see Cereus Prod. Dev., Inc. v. Boom LLC*, No. 14-CV-4292 (PAC), 2015 WL 3540827, at *7 (S.D.N.Y. June 5, 2015) (denying a motion to dismiss because "[t]he complaint clearly alleges that Defendants spoke to [the third party], *pitched their business based on information improperly gleaned from Plaintiff*, and made misleading statements regarding the stability of Plaintiff's business" (emphasis added)). Here, the

---

[2] Although Jawad's other claims are alleged under Pennsylvania (or federal) law, the parties appear to agree that New York law controls the tortious interference claim. *See* ECF No. 31 ("Opp."), at 15-18. Once again, that suffices for choice-of-law purposes. *See, e.g.*, *Fed. Ins. Co.*, 639 F.3d at 566.

11

Counterclaim Complaint fails to satisfy that requirement. That is, it fails to allege that Kornotzki's activities were "directed at" any of the third parties with whom Jawad had business relations. Instead, it alleges that Kornotzki's activities were directed against Jawad himself. *See* Opp. 16 ("Jawad describes in detail how Kornotzki interfered with those business relations, namely through Kornotzki's unauthorized incursion into Jawad's email account and his efforts to deny Jawad access to Jawad's own archived emails and data."); Compl. ¶¶ 122-134. It was Jawad who, in turn, disclosed Kornotzki's activities to the third parties with whom he did, or hoped to do, business. *See* Compl. ¶ 66. It follows that Jawad fails to plausibly allege a claim of tortious interference with business relations.

## CONCLUSION

For the foregoing reasons, Kornotzki's motion to dismiss is GRANTED as to Jawad's claim for tortious interference and DENIED as to Jawad's remaining claims. The Court declines to *sua sponte* grant leave to amend the tortious interference claim. Although leave to amend should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), it is "within the sound discretion of the district court to grant or deny leave to amend," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Here, Jawad does not request leave to amend to cure any deficiencies in his tortious interference claim. *See* Opp. 21; ECF No. 41, at 1 (seeking leave only to "add causes of action for conversion and trespass to chattels"). Jawad also fails to indicate that he is "in possession of facts that would cure the problems identified in this opinion," which are substantive in nature. *Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014); *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (per curiam) ("Where it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend."). Finally, Jawad was previously granted leave to amend his counterclaims to cure the deficiencies raised in Kornotzki's motion to dismiss — and

expressly warned that he would "not be given any further opportunity" to do so.  *See* ECF No. 23. Accordingly, leave to amend the dismissed tortious interference claim is denied. The Clerk of Court is directed to terminate ECF No. 28.

    SO ORDERED.

Dated: May 19, 2020
       New York, New York

                                        JESSE M. FURMAN
                                        United States District Judge